Ethel C. JONES

v.

UNITED STATES of America.

Civ. A. No. 2772.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

March 25, 1965.

John Dale Powers, Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, La., for plaintiff.

Gene S. Palmisano, Asst. U. S. Atty., E. D. of Louisiana, New Orleans, La., for defendant.

WEST, District Judge.

On or about April 9, 1962, at about 6:15 p. m., plaintiff, Ethel C. Jones, was driving a 1951 Chevrolet automobile when it was involved in a collision with a postal delivery truck owned and operated by the United States Post Office Department. Plaintiff brings this suit against the United States of America under the Federal Tort Claims Act, 28 U.S.C.A. § 1291 et seq., seeking recovery for property damage and personal injuries allegedly sustained as a result of the collision. While the Court is convinced, after hearing the evidence adduced at the trial of this case, that the accident complained of was proximately caused by the driver of the defendant's vehicle, and that the plaintiff was free of contributory negligence, it is further convinced that there were no personal injuries resulting from this accident, and that there were only very minor damages to plaintiff's vehicle resulting therefrom.

Immediately prior to the accident, plaintiff was traveling in a westerly direction on North Boulevard in the City of Baton Rouge, Louisiana, and was anticipating making a right hand turn onto Fourteenth Street. She was traveling at about 30 miles per hour, and then slowed to about 10 miles per hour immediately prior to making her right hand turn. Also, immediately prior to the accident, Myron M. Neely, the driver of the defendant vehicle, while in the course and scope of his employment with the United States Postal Department, was stopped parallel to the curb on the right side of North Boulevard, a short distance east of the intersection of North Boulevard and Fourteenth Street. As the plaintiff began her right hand turn, Mr. Neely pulled forward and out to his left from the curb on the right side of North Boulevard, and in so doing, struck the

right rear fender of plaintiff's vehicle with the left front fender of his vehicle. At the time of impact, the plaintiff had made her turn to the right, and was traveling at approximately four miles per hour, and the defendant's vehicle was traveling about one mile per hour. The evidence shows, without doubt, that the driver of the defendant's vehicle either failed to look to ascertain whether it was safe for him to pull out from the curb and attempt to move into the westbound traffic on North Boulevard, or, that he looked but failed to see what he should have seen, i. e., the plaintiff's vehicle in the process of passing his vehicle and attempting to make a right hand turn in front of the defendant's vehicle. The evidence clearly establishes that the collision was caused entirely by the fault of the driver of the postal vehicle, and that Mrs. Jones, the plaintiff, did not in any manner contribute to the cause of this accident. Thus, on the question of liability, there is simply no doubt that the defendant is legally liable to the plaintiff for any and all damages sustained by her as a proximate result of this collision. While the question of liability in this case is easily resolved in favor of the plaintiff, the question of whether or not there were any damages suffered by the plaintiff as a result of the accident is much more difficult to determine.

The collision which occurred on April 9, 1962, between these two vehicles was exceedingly minor. The plaintiff's vehicle was moving at a very slow rate of speed as it made its right hand turn, and the defendant's vehicle was only "creeping" away from the curb at the time the two vehicles collided. The two police officers who investigated this accident, Mr. Roland J. Brouillet and Mr. Wayne O. Cooper, both testified that the impact was obviously very slight, and they both estimated the damages to plaintiff's automobile at not in excess of $25. These officers testified that the only visible damage to plaintiff's vehicle was a slight indentation to the right rear fender. They testified that they noticed no damage to the right rear door or to any other portion of plaintiff's vehicle. There was no visible damage to the postal truck. The rear bumper of plaintiff's vehicle had become hooked with the front bumper of the postal truck. Immediately following the accident, as the plaintiff alighted from her automobile, she informed Mr. Neely, the driver of the defendant's vehicle, that she was not injured. The plaintiff showed no indication at that time of being emotionally disturbed in any way, and merely suggested to Mr. Neely that they unhook the locked bumpers in order that she might proceed on her way home. However, Mr. Neely advised her that because of the fact that his vehicle was a Government vehicle, postal regulations required him to report the accident to a postal inspector, and that all of the parties should remain at the scene until the inspector and the police arrived. After the police officers arrived, they investigated the accident, found only the minor damages referred to above, and satisfied themselves that there were no personal injuries to anyone resulting from this collision. At the same time the vehicles were also inspected by Mr. William J. Robinson, who was, at the time, general foreman of mails attached to the Baton Rouge office. He came to the scene of the accident pursuant to Mr. Neely's call. He testified that his examination and investigation at the scene of the accident revealed that there were no personal injuries to anyone involved, and that the plaintiff was not in any way emotionally upset, but on the contrary, appeared to be in a "jolly mood." He further noted that the two bumpers were locked together, and that there was "slight damage" to the right rear fender of the plaintiff's vehicle. There was no visible damage whatsoever to the postal truck. Following this investigation, the bumpers of the two vehicles were disengaged, and both vehicles proceeded on their way.

At the time of this accident on April 9, 1962, there was a passenger riding in the plaintiff's vehicle with her. This person was one Florida Daigre, a Negro woman who worked in the same dental office in which the plaintiff was employed.

During the latter part of June, 1962, or some two and one half months following the accident, the Post Office Department received a letter from Florida Daigre addressed to "To Whom It May Concern" in which she stated that she was involved in a collision with a postal vehicle in April of 1962, and that she had sustained rather serious injuries to her head and back, and was, at that time, experiencing bleeding from her rectum. The letter concluded with: "If treated fair, will settle out (sic) off court (offer). THANK:" Because of the fact that this letter indicated rather serious personal injuries, Mr. Joseph A. Benda, the postal inspector, interviewed the plaintiff, Mrs. Jones, at her residence, on June 22, 1962. At that time, Mrs. Jones had made no claim against the Postal Department or anyone else in connection with the accident of April 9, 1962. When Mr. Benda informed the plaintiff that the Postal Department had received the letter from Florida Daigre stating that she had received rather serious injuries in this accident, the plaintiff replied that she could not understand how anyone could have been hurt in that accident because of the fact that it was so very slight. During the course of the interview with Mr. Benda, the plaintiff advised him that she had been in a prior accident on April 4, 1962, and that that accident was a more severe accident than was the one of April 9, 1962. She stated to Mr. Benda that she was being treated by Dr. Thomas Campanella, an orthopedic surgeon. Unfortunately, Mr. Benda did not question the plaintiff at that time concerning the origin of the injuries for which she was being treated by Dr. Campanella, but assumed, in view of the plaintiff's reference to the more severe accident of April 4, 1962, that any injuries for which she was being treated resulted from that accident. This assumption was further based upon the plaintiff's assertion that she could not understand how anyone could claim to have been hurt in the accident of April 9 because of the fact that it was so slight. The fact remains that the plaintiff did not make any claim against the Postal Department for any damages resulting from the accident of April 9, 1962, until January of 1963. At the time of Mr. Benda's investigation, the plaintiff negated all indications of any injury arising out of the accident of April 9, and gave no indication of any kind that she intended to make any claim against the Post Office Department arising out of this slight accident.

The testimony given by Florida Daigre during the trial of this case is so completely at odds with all of the other testimony in the case as to be completely unbelievable. She testified that this collision was so violent that she was thrown to the floor of the automobile, striking her head on the dashboard and causing contusions and abrasions of her knees. Her testimony is simply not worthy of belief as it is completely contradicted by all of the other evidence in this case.

It was established during trial that the plaintiff had been involved in two other accidents, one just prior to that of April 9, 1962, and one subsequent to April 9, 1962. On April 4, 1962, or five days prior to the accident involved in this law suit, plaintiff was involved in another accident. She was traveling at approximately 30 miles per hour when she ran into the rear of a stopped truck. The truck was stopped at a signal light, and the plaintiff testified that she had no brakes on her automobile and was, in fact, on the way to have the brakes repaired. She stated that she realized she was going to have a collision and braced herself in expectation of the impact. However, the facts of that accident do not bear out plaintiff's testimony. Officer Earl Williams, who investigated that accident, testified that the plaintiff's automobile left 19 feet of skid marks leading up to the point of collision with the truck, which certainly indicates that her vehicle was not without brakes at the time of that accident. Furthermore, Officer Williams testified that upon his arrival at the scene of that accident, he found the plaintiff sitting in her automobile in an extremely disturbed emotional state. She was crying and hysterical, and was obviously very upset. She did

not get out of her automobile during the course of the investigation. Officer Williams testified that he did not observe any outward appearances of injuries sustained by plaintiff in that accident. He estimated the damage to the plaintiff's automobile at approximately $85, and the damage to the rear of the parked truck to be in the vicinity of $15.

Again, on May 16, 1962, the plaintiff was involved in a third accident. This time her automobile was apparently sideswiped by a heavily laden brick truck that failed to stop following the accident. The plaintiff notified the police and angrily reported the accident. While the plaintiff testified that her vehicle was not damaged in this accident, the police who investigated estimated the damage to her vehicle to be approximately $35. But the important fact is that during the course of this trial, the plaintiff repeatedly denied that she had been involved in any accident on May 16, 1962, and it was not until she was confronted with a copy of the police accident investigation report that she finally admitted the occurrence of this accident.

Plaintiff now claims that despite the accidents of April 4 and May 16, that all of the injuries of which she now complains were caused entirely by the accident of April 9, 1962. She states that it was not until the night of April 9 that she began to feel uncomfortable or to experience pain, and that it was on the next day, April 10, 1962, that she went to see Dr. Thomas Campanella. When the plaintiff visited Dr. Campanella on April 10, 1962, it is interesting to note that she did not at any time inform him of the fact that she had been in a collision on April 4, 1962, which was, in fact, a much more violent collision than was the one of April 9, 1962. There is an indication that she told Dr. Campanella's nurse that she had been involved in a prior accident, but at no time did she tell Dr. Campanella of this accident. Dr. Campanella concluded that the plaintiff had a sprain of the cervical, dorsal, and lumbosacral junction with a strain of the musculature of these re-

gions. He concludes that her symptoms were largely subjective, and that they were greatly exaggerated because of what he termed a disturbed emotional state at the time of his examination. Neurological and x-ray examinations were completely negative, and he prescribed only analgesics, muscle relaxants, vitamin B-12 and heat applications. The plaintiff did not return to Dr. Campanella until some five months later, on September 18, 1962, at which time her complaints were the same as at her previous visit. Examination at that time revealed only subjective symptoms of tenderness with no evidence of muscle spasm or swelling. Dr. Campanella simply advised her to continue the same treatment as previously prescribed. Four months then elapsed before the plaintiff again visited Dr. Campanella on January 22, 1963. She complained of pain in her neck and back and complained that she was constantly nervous. Dr. Campanella then prescribed the use of a Thomas collar and a lumbosacral support. Plaintiff's next visit to Dr. Campanella was on March 12, 1963, when he found her to be in an extremely apprehensive state. There was apparently no change in her condition, and she was then admitted to the hospital and placed in traction. She failed to respond to this treatment, and Dr. Campanella then conducted further x-ray studies and performed a myelogram. Both the myelogram and x-ray studies were completely negative, and it was then the doctor's opinion that "This young lady had developed a more or less mental depression due to the prolonged symptomatology." Her final visit to Dr. Campanella was on September 13, 1963, at which time the doctor observed that she had improved considerably, and that her injuries and symptoms had largely resolved.

On cross examination Dr. Campanella stated that there was no way that he or anyone else could tell which accident caused the plaintiff's difficulties. He stated that it was extremely difficult to see how such a slight accident as that which occurred on April 9, 1962, could

have caused as much injury as was complained of by the plaintiff. However, he stated that it was his opinion that a person would be more apt to receive a whiplash type injury when being struck from the side or from behind, as the plaintiff was in the accident involved here, than when she was in an accident in which she struck another vehicle from behind. He reasoned that in the latter instance the plaintiff would have been in a position to have anticipated the impact, and thus would not receive the same "whiplash" effect from the collision. He further reasoned that since the plaintiff claims her injuries to have manifested themselves one day following the accident of April 9, it would be more likely that the injuries occurred on April 9 rather than five days previously on April 4, and thus, in his opinion, it was more likely that the injuries occurred as a result of the second accident. However, Dr. Campanella stated that the only reason for his conclusion that her injuries resulted from the second accident rather than the first was that she complained sooner after the second accident than she did after the first accident. If it were not for that one factor, which, of course, was entirely dependent upon the veracity of the plaintiff, he was not in a position to say which of the accidents caused the injury complained of. In any event, it was his testimony that the symptoms which he found were almost entirely subjective, which necessarily depended upon the veracity of the plaintiff, and that the only objective symptom which he found, namely, some evidence of muscle spasm, could have been caused by a state on anxiety just as well as by physical trauma to the area. It was his opinion that the plaintiff greatly exaggerated her pain, and he could not understand why, if the plaintiff was actually suffering as she claimed she was, that there was such long lapses between her visits to his office.

Dr. Duane Forman, a neurosurgeon, examined the plaintiff on April 16, 1963, which was more than a year after the accident occurred. His examination revealed no objective findings, and he too performed a myelogram on April 18, 1963, which was completely negative. It was his opinion that the plaintiff had sustained a sprain of the spine at the cervical and lumbar areas, and that her condition had been exaggerated as a result of severe nervous tension. He found no objective findings of any kind, and his entire opinion was necessarily based upon the veracity and truthfulness of the plaintiff in stating her complaints. He felt that she would get considerably better "as soon as this suit is over."

Dr. George J. Caruso, a psychiatrist, also testified on behalf of the plaintiff. He examined the plaintiff on two occasions in 1964, and it was his opinion that this plaintiff was suffering from what he termed a conversion reaction related to the accident. It was his opinion that her nervous condition and state of anxiety pre-dated the accident of April 9. It was his opinion, arrived at as a result of his examinations of the plaintiff, that this suit was filed against the Post Office Department simply because she was "highly insulted over a $23 offer to settle her claim for property damage, and because her medical expenses were high." He testified that during his examinations of the plaintiff, he noted a stiffness of the facial musculatures that relaxed considerably when she became angry. He also testified that after the plaintiff left his office, he observed her from his office window, and noticed that she had no difficulty looking from right to left and up and down the street despite the fact that while in his office she evidenced considerable difficulty in making these movements.

It is also of significance that Dr. Caruso had no knowledge of the accident of April 4 or of May 16 when he consulted with and examined the plaintiff. He testified that it was impossible for him to tell which of the accidents caused her difficulties, and that to even venture a guess he would have to rely completely upon the veracity of the plaintiff. It was his opinion that if, as a matter of fact, she had no symptoms following the first accident but did have symptoms immedi-

ately following the second accident, that he would have to conclude that whatever damages might have been caused by either accident were, in fact, caused by the second accident. He again reiterated, however, that in order to arrive at such a conclusion, he would have to rely on the plaintiff's truthfulness in order to establish the date upon which the symptoms actually appeared.

The plaintiff was examined at the request of the defendant by Dr. I. L. George, an orthopedic surgeon. This examination was conducted by Dr. George on June 24, 1964. Dr. George had been specifically requested by the defendant to question the plaintiff as to whether or not she had been involved in any accidents prior to the one of April 9, 1962. This inquiry was made by Dr. George, and the plaintiff denied categorically that she had been in any accident other than the collision with the postal vehicle on April 9, 1962. Dr. George's findings were largely subjective in nature, and were, of course, also entirely dependent upon the veracity of the plaintiff. At first Dr. George testified that he was of the opinion that the accident of April 4, 1962, more likely caused the plaintiff's difficulties, and that this opinion was based upon the fact that it was obviously a more severe impact. However, he later testified that in his opinion it would be more probable that injuries from such an accident would manifest themselves on the day following the accident than five days following the accident. However, it was his opinion that he could not tell with any degree of certainty which accident caused the injuries, and that the question of when the injuries manifested themselves was purely a subjective matter.

The evidence in this case thus presents a picture of the plaintiff having been involved in an extremely minor accident which did very little other than lock the bumpers of two automobiles together. This accident was on April 9, 1962. It further presents the picture of a plaintiff who had been involved in another accident five days previously, in which accident she had been traveling at a much greater rate of speed, had come upon a vehicle stopped in the traffic lane ahead, had applied her brakes and skidded 19 feet before the impact with the rear of the parked vehicle. That accident, of April 4, 1962, according to the testimony of the police officer, left the plaintiff in a highly emotional state, sitting in her car crying when the police arrived. In contrast to this, the accident here involved, of April 9, 1962, found the plaintiff in a "jolly mood," standing outside of her vehicle, suggesting that the parties merely unlock the bumpers so that she could proceed on her way home. We further have the picture of a plaintiff who, according to the medical testimony, was suffering from a depressive reaction, and who presented subjective symptoms of cervical, dorsal, and lumbosacral sprain, but whose visits to the doctor are some four and five months apart.

 In a civil action for damages, the burden is upon the plaintiff to prove, by a preponderance of evidence, every essential element of the claim asserted. This principle of law applies, of course, to the proof of damages as well as to the proof of liability. To prove the truth of an assertion by a preponderance of the evidence simply means to prove, by the production of such evidence as will convince the trier of facts, that the issue asserted is more likely so than not so. It is not sufficient that the plaintiff make out her cause to a mere probability. Her evidence must be clear and convincing enough to produce in the mind of the trier of fact a belief as to the truth of the allegation sought to be proved. And of course, it goes without saying that preponderance of evidence does not mean simply the production of a greater number of witnesses on her behalf than may have been produced by the defendant. To determine whether or not an issue has been proved by a preponderance of evidence it is necessary for the Court to carefully weigh all of the evidence adduced, and in weighing this evidence, it is particularly important that the veracity of the witnesses be carefully examined

and evaluated. This is particularly true where the evidence permits conflicting conclusions.

There is very little doubt, of course, that this plaintiff, when seen by Dr. Campanella on April 10, 1962, was suffering from some sort of mental or nervous disorder and also was, in all probability, suffering from some degree of cervical strain. But the question now involved is when and how did these involvements originate. In order for the plaintiff to recover from the defendant in this case, it is, of course, necessary that she carry the burden of proving, by a preponderance of the evidence, that the injuries of which she complains were proximately caused by the accident of April 9, 1962. Every doctor who examined this plaintiff testified, without exception, that in order to make a valid determination of the extent of her disorders, it is necessary to rely upon her veracity, and that any speculation as to the origin of her disorders must also be largely dependent upon her truthfulness. It is extremely significant to note, as previously mentioned herein, that none of the doctors involved were given the benefit of the information that this plaintiff had been involved in a prior accident on April 4, 1962, and a subsequent accident on May 16, 1962. There is little doubt that such information was absolutely necessary in order for the doctors to even attempt to determine the origin of the difficulties of which she complained at the times of her various examinations. Not only were they uninformed as to these other accidents, but at least in the case of Dr. George, she specifically denied having been involved in any accident prior to the one of April 9. This Court finds it extremely difficult to place any great reliance upon the testimony of this plaintiff in view of the many inconsistencies between her testimony and the facts as ultimately found to exist. After having finally elicited the fact from her that she was involved in an accident on April 4, she was asked to describe how it occurred. It was her testimony that she had no brakes on her automobile and

that she was taking it to the garage to be fixed; that she saw the parked vehicle ahead of her but was unable to stop because she had no brakes. This is simply not borne out by the other testimony which showed that her brakes were in working order and that she left approximately 19 feet of skid marks before striking the other vehicle. The plaintiff denied emphatically that she had been involved in any accident subsequent to the one on April 9, 1962, and it was not until she was confronted with the actual police report of the accident that she finally admitted that on May 16, 1962, she was again involved in a collision which, from the evidence, seems to have been at least as serious as the accident in which she was involved on April 9. The plaintiff, on the witness stand, repeatedly denied ever having spoken with Postal Inspector Joseph A. Benda, but the evidence clearly establishes that she was interviewed at quite some length by Mr. Benda on June 22, 1962, at her home, at which time she evidenced surprise at the fact that Florida Daigre would claim to have been injured in this accident because, as she put it, she could not understand how anyone could have been injured in so slight an accident. Upon inquiry by Dr. George, the plaintiff specifically denied that she had been in a prior accident, when the truth of the matter was that she had, indeed, only five days previous to the current accident, been involved in another collision which was certainly more severe than the accident involved in this case. In addition to these discrepancies in her testimony, the Court cannot overlook the fact that the evidence clearly establishes that immediately following the accident of April 4, 1962, the plaintiff was apparently unable to get out of her automobile and was sitting therein when the police arrived. At that time she was crying and was apparently hysterical, while after the accident of April 9, 1962, when the postal inspectors and the police arrived, the plaintiff was in a "jolly mood," standing beside her automobile suggesting that they merely unhook the bumpers so that she might proceed home. As stated before, the tes-

timony of Florida Daigre is, in the opinion of this Court, completely unbelievable. Her testimony concerning the severity of the accident of April 9 is simply contradicted by all of the other testimony in this case. There is just no evidence to sustain the plaintiff's claim of injuries resulting from the accident of April 9, 1962, except such as is completely dependent upon her own veracity, and the Court simply does not feel justified in attaching much weight to her testimony. The Court is of the same opinion as was Dr. Campanella when he testified that it was hard to believe that she could have received such injuries from such a minor collision.

█ The evidence clearly establishes the fact that this plaintiff has had, for a long time, an emotional or nervous disturbance, and the events surrounding the accident of April 4, 1962, would seem to bear this out. It is the opinion of this Court that the plaintiff has fallen far short of proving by a preponderance of the evidence that she has any physical or mental difficulties of any kind proximately caused by the accident of April 9, 1962. The accident was a minor accident, causing very minor damage to her vehicle, and one which, under the circumstances of this case, simply cannot be considered to have been the cause of her present difficulties. It is far more likely that the accident of April 4, 1962, had much more to do with her present condition than did the accident of April 9. And certainly the testimony of her employer, Dr. R. A. Englerth, does not completely eliminate the possibility that the strain of the plaintiff's employment by what appeared to be a rather demanding and critical employer, had much to do, over an extended period of time, with the plaintiff's present emotional disturbances.

█ Actually, it may even be stretching a point a bit for the Court to hold that the plaintiff has proved, by a preponderance of the evidence, that the automobile damage, amounting to $63.00, was actually caused by this accident. It was some eight months following the accident before this vehicle was repaired, and Mr. Tom Longino, who estimated the damages, had no way of knowing whether or not the damages he viewed were caused by the accident which occurred eight months previous thereto. However, his testimony was that the total repair bill was $63.33, of which amount approximately $54.00 was for labor and $9.33 was for paint and supplies. No parts were involved in the repairs. He testified that he had to straighten the rear quarter panel and the rear fender of the automobile. There was considerable question as to whether or not the rear quarter panel was damaged in this collision, and this Court has doubts on that question also. However, since there was no direct evidence concerning damage to that portion of the automobile by the prior or subsequent accidents, the Court concludes that the plaintiff is entitled to recover the cost of repairing her vehicle in the total sum of $63.33. The plaintiff, having failed to prove by a preponderance of the evidence that she received any personal injuries as a result of the accident of April 9, 1962, must be denied recovery on all other claims herein asserted.

Judgment will be entered accordingly.